**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-2017
_____

CARLOS EDUARDO BASTARDO-VALE,
Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA,
Respondent
_____

On Petition for Review of an Order of
The Board of Immigration Appeals
(Agency No. A206-907-703)
Immigration Judge: Quynh Vu Bain
_____

Argued on May 24, 2018 before Merits Panel
Argued En Banc on May 15, 2019
_____

Before: SMITH, <u>Chief Judge</u>, McKEE, AMBRO,
CHAGARES, JORDAN, HARDIMAN, GREENAWAY, JR.,
SHWARTZ, KRAUSE, RESTREPO, BIBAS, PORTER, and
MATEY, <u>Circuit Judges</u>.

(Filed: August 12, 2019)


Rosa Barreca
1308 South 8th Street
Philadelphia, PA 19147

Cherylle C. Corpuz [ARGUED]
Morais Law
101 West Main Street
Suite 101
Moorestown, NJ 08057

*Counsel for Petitioner*

Benjamin M. Moss [ARGUED]
Judith R. O'Sullivan
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044

*Counsel for Respondent*

Joseph C. Hohenstein [ARGUED]
Landau Hess Simon & Choi
190 North Independence Mall West
Suite 602
Philadelphia, PA 19106

*Counsel for Amicus Curiae American Immigration Lawyers Association*
_____

2

## OPINION OF THE COURT
_____

SHWARTZ, <u>Circuit Judge</u>.

Today we decide whether the phrase "particularly serious crime" as used in both the asylum and withholding of removal statutes, 8 U.S.C. §§ 1158(b)(2), 1231(b)(3), includes, but is not limited to, aggravated felonies. We hold that it does. The phrase "particularly serious crime" means the same thing in both statutes, and the language of those statutes shows that aggravated felonies are a subset of particularly serious crimes.

In reaching this conclusion, we overrule <u>Alaka v. Attorney General</u>, 456 F.3d 88 (3d Cir. 2006), where we defined the phrase "particularly serious crime" in the context of withholding of removal to include only aggravated felonies. Because we revisit this precedent and agree with the Board of Immigration Appeals' ("BIA") decision that Petitioner Carlos Eduardo Bastardo-Vale committed a particularly serious crime that barred him from obtaining asylum and withholding of removal relief, we will deny the petition for review.

I

Bastardo-Vale petitions for review of the BIA decision that his conviction for second-degree unlawful imprisonment under Delaware law constitutes a "particularly serious crime," rendering him ineligible for both asylum and withholding of removal relief. 8 U.S.C. §§ 1158(b)(2), 1231(b)(3). His state conviction arose from a forcible sexual encounter with a

3

college freshman ("victim"). At the time of the incident, Bastardo-Vale, a native and citizen of Venezuela who entered the United States on a nonimmigrant student visa, was a graduate resident assistant at Goldey-Beacom College.

In the early morning of November 10, 2013, Bastardo-Vale returned to his apartment. There, by the victim's account, Bastardo-Vale invited her to his apartment where he forcibly pulled her into his room and began raping her, or by Bastardo-Vale's account, they began to have consensual sex. According to the police report, the victim told Bastardo-Vale to "'stop' numerous times but he refused." A.R. 2187. She "freed herself by using her knee to strike [Bastardo-Vale] in the rib cage and push him off of her body." Id. The victim and Bastardo-Vale both left the apartment. About forty-five minutes later, Bastardo-Vale encountered security guards elsewhere on campus, who told him that they were looking for him because he had been accused of rape and instructed him to "stay." A.R. 260. Bastardo-Vale ignored their direction, returned to his apartment to retrieve a used condom, and tossed it into a dumpster. He claimed that he discarded the evidence because, as a graduate resident assistant, he risked losing his scholarship by having sexual relations with a freshman.

Bastardo-Vale pleaded no contest to second-degree unlawful imprisonment in violation of Del. Code Ann. tit. 11, § 781 and was sentenced to the maximum term of one year's imprisonment, which was suspended for eleven months of time served.

The Department of Homeland Security ("DHS") then charged Bastardo-Vale with removability under 8 U.S.C. § 1227(a)(2)(A)(i), for being convicted of a crime involving

4

moral turpitude, and under 8 U.S.C. § 1227(a)(1)(C)(i), for failing to comply with the conditions of his nonimmigrant status. The Immigration Judge ("IJ") found Bastardo-Vale was removable because he had stopped attending college and thus failed to comply with the "conditions of his admission to non-immigrant student status." A.R. 197. Bastardo-Vale applied for asylum, withholding of removal, and Convention Against Torture ("CAT") relief based primarily on his claim that he was harmed in his country of origin on account of an imputed political opinion stemming from his mother's political activities. DHS argued that Bastardo-Vale was not entitled to asylum and withholding of removal because he had been convicted of a particularly serious crime and was a "danger to the community of the United States." 8 U.S.C. §§ 1158(b)(2)(A)(ii), 1231(3)(B)(ii). The IJ rejected that argument and instead of applying Alaka, which limited the phrase "particularly serious crime" to aggravated felonies, it relied on In re N-A-M-, 24 I. & N. Dec. 336 (BIA 2007), aff'd per curiam, 587 F.3d 1052 (10th Cir. 2009). Applying N-A-M-, the IJ determined that Bastardo-Vale's conviction was not for a particularly serious crime because (1) it "was based on a plea agreement pursuant to which [he] pled no contest," A.R. 203; (2) there was no evidence suggesting he used "physical force to confine the victim in his apartment," A.R. 204, and (3) he "received a sentence of one year, all of which was suspended for time served . . . [which] suggest[s] that the criminal court did not consider him a danger to the community," A.R. 204. The IJ noted that Bastardo-Vale's attempt to dispose of evidence was "very troubling" but insufficient to make his crime a particularly serious offense. A.R. 204. The IJ therefore found that he was eligible for asylum and had no need to consider his request for withholding of removal or CAT relief. DHS appealed the IJ's finding that

5

Bastardo-Vale's conviction was not for a particularly serious crime.

The BIA agreed with DHS, disregarded our precedent in Alaka, and held that Bastardo-Vale had "been convicted of a particularly serious crime under [the BIA's] case-by-case approach set forth in," among other cases, N-A-M-. A.R. 6. The BIA concluded that the Delaware unlawful imprisonment statute encompasses conduct involving physical force and intimidation, as well as that which "places at risk a particularly vulnerable segment of society . . . [so the] conviction falls within the potential ambit of a particularly serious crime." A.R. 6. The BIA concluded the circumstances of Bastardo-Vale's offense demonstrated its seriousness because "[t]he use of physical force to overcome another's desire to terminate a sexual encounter, whether originally consented to or not, is an inherently violent act that places a victim in fear for their safety." A.R. 6-7. The BIA held that Bastardo-Vale's conviction for a particularly serious crime barred him from receiving asylum and withholding of removal but remanded the matter to the IJ to address whether he was entitled to CAT relief.[1]

---

[1] In reaching this conclusion, the BIA did not cite and in fact did not follow Alaka. Rather, it relied upon its own decision in In re M-H-, 26 I. & N. Dec. 46 (BIA 2012), where it held that, under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), and National Cable & Telecommunications Ass'n v. Brand X Internet Services, 545 U.S. 967 (2005), it had the authority to apply its own interpretation. The BIA in M-H-, in turn, reasoned that (1) Alaka did not hold that 8 U.S.C. § 1231(b)(3)(B) was unambiguous, M-H-, 26 I. & N. Dec. at 49, (2) applying its

6

own precedent to matters arising in the Third Circuit would "promote national uniformity in the application of the particularly serious crime bar for withholding of removal," id., and (3) using its own precedent would "provide consistency in the treatment of the particularly serious crime bars for [both] asylum and withholding of removal" cases, id. at 49-50.

The IJ and BIA's blatant disregard of the binding regional precedent is ultra vires. See Abdulai v. Ashcroft, 239 F.3d 542, 553 (3d Cir. 2001) ("The BIA is required to follow court of appeals precedent within the geographical confines of the relevant circuit." (citation omitted)). While we understand the value of uniform treatment of similarly situated aliens and acknowledge that, until now, our circuit precedent differed from that of other circuits, Brand X did not provide the IJ or BIA the authority to ignore the applicable regional circuit's precedent. See Abdulai, 239 F.3d at 553; Saravia v. Att'y Gen., 905 F.3d 729, 731 (3d Cir. 2018) (holding that an IJ must follow circuit precedent despite the BIA's "subsequent contrary decision" (citation omitted)). To the contrary, Brand X provides that "[a] court's prior judicial construction of a statute trumps an agency construction otherwise entitled to Chevron deference . . . if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." 545 U.S. at 982.

In Alaka, we did not hold that the phrase "particularly serious crime" in the withholding of removal statute was ambiguous. Thus, the case on which the BIA and IJ relied, M-H-, misunderstood Alaka's view of the statutory phrase. M-H- reasoned that since Alaka did not expressly state that the

7

withholding statute was "unambiguous," the agency was free to disregard our interpretation of the statute and impose its own. 26 I. & N. Dec. at 49. There are two related problems with this view. First, Alaka stated that the "plain language and structure" of the withholding statute "indicate[d] that an offense must be an aggravated felony" to be particularly serious. 456 F.3d at 104. This demonstrated that the Alaka court did not view the withholding statute as ambiguous. Second, the absence of Chevron-type language from Alaka, such as an explicit statement that the statute was unambiguous, is understandable because the BIA had not interpreted the clause at issue when the Alaka court ruled. Thus, the Alaka court had no reason to use language relevant to deciding whether we are obligated to defer to an agency's interpretation. The lack of magic words like "unambiguous" and use of words like "suggest" or "implies," when viewed in context of Alaka's focus on the statute's language and structure, conveys that it viewed the statute as clear. See Texas v. Alabama-Coushatta Tribe of Texas, 918 F.3d 440, 447 (5th Cir. 2019) (holding that a "prior judicial decision need not say in so many magic words that its holding is the only permissible interpretation of the statute in order for that holding to be binding on an agency" (internal quotation marks and citations omitted)). Because the BIA's interpretation of Alaka is predicated on an erroneous view that Alaka did not hold that the statute was unambiguous, we need not defer to its interpretation. Compare M-H-, 26 I. & N. Dec. at 49, with Alabama-Coushatta Tribe, 918 F.3d at 449 (holding that "a court should not defer to an agency's interpretation of a statute if a 'judicial precedent hold[s] that the statute unambiguously forecloses the agency's interpretation'" (quoting Brand X, 545 U.S. at 982-83)).

8

On remand, Bastardo-Vale withdrew his CAT claim, and the IJ ordered Bastardo-Vale removed. Bastardo-Vale appealed the IJ's decision to the BIA for it to certify the ruling as final and petitioned our Court for review.[2] The BIA determined that "there [was] nothing left for [it] to decide regarding" Bastardo-Vale's asylum or withholding of removal applications, Supp. App. 10, but again remanded the matter for the IJ to determine his country of removal. The IJ subsequently ordered Bastardo-Vale removed to Venezuela.

Bastardo-Vale seeks review of the BIA's determination that his conviction for second-degree unlawful imprisonment qualifies as a particularly serious crime and asserts that he is entitled to asylum and withholding of removal. He claims that the BIA erred in disregarding Alaka and holding that his non-aggravated offense was a "particularly serious crime" that bars him from relief.

After oral argument before a panel of our Court, we elected sua sponte to hear the case en banc to determine whether Alaka remains good law. We now examine the phrase "particularly serious crime" under both the asylum and withholding of removal statutes as well as the rulings of our sister circuits who have concluded that the phrase "particularly

---

[2] Although Bastardo-Vale prematurely filed his petition for review before a final order of removal was entered, such an order has since been entered, and thus we now have jurisdiction under 8 U.S.C. § 1252(a)(1). See Khan v. Att'y Gen., 691 F.3d 488, 494 (3d Cir. 2012). The Government recognizes that we have jurisdiction and has moved to withdraw its motion to dismiss for lack of jurisdiction, which we will grant.

9

serious crime" is not limited to aggravated felonies in either the asylum or withholding of removal context.

## II[3]

## A

The IJ granted Bastardo-Vale asylum but the BIA overturned that ruling because it found that Bastardo-Vale was convicted of an offense it deemed to be a particularly serious crime, even though it was not an aggravated felony. To determine whether this is correct, we will first review the statutory framework for asylum.

The Secretary of Homeland Security or the Attorney General may grant an asylum application if the alien shows that he is a "refugee" who is persecuted due to his race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1158(b)(1)(B)(i). Asylum, however, is unavailable to an alien, "convicted by a final judgment of a particularly serious crime," whom the Attorney General determines "constitutes a danger to the community of the United States." Id. § 1158(b)(2)(A)(ii).

The phrase "particularly serious crime" is not defined in § 1158, but Congress included two "Special Rules" within the asylum statute addressing the subject. Id.

---

[3] The IJ had jurisdiction under 8 C.F.R. § 1208.2 and the BIA had jurisdiction under 8 C.F.R. § 1003.1(b). When, as here, the BIA issues its own opinion on the merits, we review the BIA's decision, not that of the IJ. Mahn v. Att'y Gen., 767 F.3d 170, 173 (3d Cir. 2014) (citation omitted).

§ 1158(b)(2)(B).  The Special Rules provide:

(i) Conviction of aggravated felony

For purposes of clause (ii) of subparagraph (A) [which bars an alien convicted of a particularly serious crime from asylum relief], an alien who has been convicted of an aggravated felony shall be considered to have been convicted of a particularly serious crime.

(ii) Offenses

The Attorney General may designate by regulation offenses that will be considered to be a crime described in clause (ii) . . . of subparagraph (A).

Id.  While the language in subsection (i) automatically designates aggravated felonies as particularly serious crimes, subsection (ii) shows that Congress did not limit the definition of particularly serious crimes to aggravated felonies.  Indeed, the asylum statute authorizes the Attorney General to designate by regulation other offenses as particularly serious crimes.  Id. § 1158(b)(2)(B)(ii).  To say that the statute limits the types of offenses that could be considered particularly serious to aggravated felonies would render superfluous the Attorney General's power to designate offenses as particularly serious crimes by regulation.  Gao v. Holder, 595 F.3d 549, 556 (4th Cir. 2010).  Our reading ensures that we "give effect to every word" of the statute.  Leocal v. Ashcroft, 543 U.S. 1, 12 (2004) (citation omitted).

Moreover, reading "particularly serious crime" to include only aggravated felonies would improperly render the phrase meaningless as it would just be an alternate phrase for "aggravated felony." See TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (internal quotation marks and citation omitted)). Reading the plain language of the asylum statute to provide that aggravated felonies are just one category of crimes that are deemed particularly serious would give the phrases "particularly serious crime" and "aggravated felony" independent meaning.

Such a reading would also render meaningless the Attorney General's power to designate other crimes as serious. See Delgado v. Holder, 648 F.3d 1095, 1106 (9th Cir. 2011) (en banc) ("There is little question that this latter provision permits the Attorney General, by regulation, to make particular crimes categorically particularly serious even though they are not aggravated felonies." (emphasis omitted)); Gao, 595 F.3d at 556 ("Given that the statute makes all aggravated felonies per se particularly serious, the Attorney General's power to designate offenses as such by regulation would be 'wholly redundant' if it were limited to aggravated felonies." (citation omitted)); Nethagani v. Mukasey, 532 F.3d 150, 156 (2d Cir. 2008) ("The Attorney General (or his agents) may determine that a crime is particularly serious for purposes of the asylum statute, 8 U.S.C. § 1158(b)(2)(B)(i), even though it is not an aggravated felony."); Ali v. Achim, 468 F.3d 462, 469 (7th Cir. 2006) ("Nowhere does § 1158 purport to prohibit the Attorney General from determining in a given case that an alien's nonaggravated felony is 'particularly serious' unless he had the

12

foresight to explicitly itemize that particular crime by regulation.").

Congress's grant of authority to the Attorney General to promulgate regulations to identify other offenses as particularly serious crimes further demonstrates that offenses other than aggravated felonies could be designated as per se particularly serious crimes. Through rulemaking, the Attorney General gives notice to the public of offenses, in addition to aggravated felonies, that may be designated as per se "particularly serious crimes" and receives comments. This authorization, however, is permissive and does not preclude the Attorney General from evaluating, on a case-by-case basis, whether the facts and circumstances of a conviction also support concluding that an individual alien committed a particularly serious crime. Immigration officials have proceeded via case-by-case adjudication since the early 1980s. See Delgado, 648 F.3d at 1106 (citing In re Frentescu, 18 I. & N. Dec. 244, 247 (1982)). We presume that Congress was aware of this procedure in 1996 when it granted the Attorney General the authority to identify by regulation categories of crimes that may be deemed per se particularly serious crimes. See id. ("Although Congress has amended the asylum statute's particularly serious crime bar over time, none of its actions have called into question the BIA's authority to designate offenses as particularly serious crimes through case-by-case adjudication."); see also Lorillard v. Pons, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change."). Thus, the grant of regulatory authority to designate classes of offenses as particularly serious crimes did not displace the Attorney General's authority to also make case-

specific determinations concerning whether an alien's offense should be deemed "particularly serious."[4]  See Delgado, 648

[4] In his dissent, Judge McKee contends that the phrase "by regulation" in the asylum statute, 8 U.S.C. § 1158(b)(2)(B)(ii), operates as a limitation that precludes the use of case-by-case adjudication to determine whether certain crimes are particularly serious.  There are several problems with this interpretation.

First, this reading overlooks the word "may" that precedes the phrase "by regulation."  Id.  The word "may" conveys permission for the agency to act in a particular way but does not mandate that the agency act only in that one fashion.  May, Merriam-Webster, https://www.merriam-webster.com/dictionary/may (last visited July 26, 2019) (defining "may" as "have permission to" or "be free to"); May, Black's Law Dictionary (11th ed. 2019) (defining "may" as "[t]o be permitted to"); see Rossman v. Fleet Bank (R.I.) Nat'l Ass'n, 280 F.3d 384, 393 (3d Cir. 2002) (noting the "permissive sense" of the word "may").

Second, Congress knows how to limit an agency to rulemaking or to adjudication.  For example, the Attorney General can parole aliens "for urgent humanitarian reasons or significant public benefit," but can do so "only on a case-by-case basis," not by using prospective rulemaking.  8 U.S.C. § 1182(d)(5)(A). Moreover, Congress has at times distinguished between mandatory and permissive uses of rulemaking.  Compare 42 U.S.C. § 1395m(a)(1)(G) ("The Secretary [of Health and Human Services] shall specify by regulation the methodology to be used" for rendering certain kinds of payments) with id. § 1395m(a)(12) ("The Secretary may designate, by regulation . . . one carrier for one or more entire regions to process all claims within the region for covered

items under this section."). Similarly, Congress has at times required agencies to use rulemaking to achieve a certain result. See, e.g., 42 U.S.C. § 6924(a) (providing that if some conditions are met, "the Administrator [of the Environmental Protection Agency] shall promulgate regulations establishing . . . performance standards"); id. § 7409(a)(1)(A) (providing that the Administrator of the Environmental Protection Agency "shall publish proposed regulations prescribing a national primary ambient air quality standard"). In short, Congress could have written the asylum statute so that the agency could proceed only by rulemaking or only by adjudication. Congress, however, has not done so here. The absence of such language makes clear that Congress did not displace the Attorney General's longstanding discretion to choose between rulemaking and adjudication. See PBW Stock Exch., Inc. v. SEC, 485 F.2d 718, 732 (3d Cir. 1973) (noting that "[t]he courts have consistently held that where an agency, as in this case, is given an option to proceed by rulemaking or by individual adjudication the choice is one that lies in the informed discretion of the administrative agency").

Third, as stated previously, Congress added the "by regulation" language within the context of the agency's regular use of case-by-case adjudication. Because Congress was aware of the agency's practice of adjudication, see Lorillard, 434 U.S. at 580, its inclusion of the "by regulation" language added another means by which the agency could categorize crimes as particularly serious: rulemaking. This interpretation of the "by regulation" clause accords with principles of administrative law. See SEC v. Chenery Corp., 332 U.S. 194, 202 (1947) (observing that "there is . . . a very definite place for the case-by-case evolution of statutory standards" because "problems may arise in a case which the administrative agency

15

F.3d at 1106 (holding that § 1158(b)(2)(B) "does not require the Attorney General to anticipate every adjudication by promulgating a regulation covering each particular crime"); Gao, 595 F.3d at 556 (rejecting the view that "regulation is the exclusive means by which the Attorney General can determine that a non-aggravated felony is a particularly serious crime" because, among other things, "requiring an agency to proceed

could not reasonably foresee, problems which must be solved despite the absence of a relevant general rule").

Finally, to the extent that Judge McKee asserts that Congress must confer adjudicatory powers upon the agency to determine which crimes are particularly serious, it has already done so. An IJ "conduct[s] proceedings for deciding the inadmissibility or deportability of an alien." 8 U.S.C. § 1229a(a)(1). The IJ, among other things, "receive[s] evidence, and interrogate[s], examine[s], and cross-examine[s] the alien and any witnesses." Id. § 1229a(b)(1). Afterwards, the IJ "shall decide whether an alien is removable . . . based only on the evidence produced in the hearing." Id. § 1229a(c)(1)(A). Congress has therefore authorized IJs to decide whether an alien is removable.

This decision, in turn, requires that an IJ consider whether there are grounds to order or not order an alien's removal. An IJ, for example, may consider a request for asylum, which includes evaluating whether there are legal impediments to receiving this relief, such as certain prior convictions. Thus, the authority to decide whether an alien is removable or eligible for relief from removal through asylum includes the authority to decide whether the alien committed a "particularly serious crime" that precludes asylum relief. See id. § 1158(b)(2)(A)(ii). As a result, Congress has delegated the power to adjudicate on a case-by-case basis to the agency.

by rulemaking alone could stultify the administrative process by rendering it inflexible and incapable of dealing with many of the specialized problems which arise" (internal citation and quotation marks omitted)); Ali, 468 F.3d at 469 (noting that "[a]n interpretation that requires the Attorney General and his agents to sift through each state's code and prospectively identify by regulation every single crime that would qualify as 'particularly serious' would impose an onerous burden," and that "[n]othing in the statute's text suggests a requirement that the Attorney General must engage in such an anticipatory task").[5]

---

[5] The congressional enactments during this period also show that the regulatory authority did not displace the Attorney General's authority to also consider whether an alien committed a particularly serious crime on a case-by-case basis. Congress amended the immigration laws in the 1990s to limit the availability of asylum and other relief, St. Cyr v. I.N.S., 229 F.3d 406, 411 n.3 (2d Cir. 2000); Garcia v. I.N.S., 7 F.3d 1320, 1322 (7th Cir. 1993), and to "expedite" the removal of criminal aliens, Patel v. Zemski, 275 F.3d 299, 304 (3d Cir. 2001), overruled on other grounds by Demore v. Kim, 538 U.S. 510, 516 (2003); DeSousa v. Reno, 190 F.3d 175, 185 (3d Cir. 1999). To this end, Congress expanded the Attorney General's authority by adding the "particularly serious crime" bar to the asylum statute in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. Congress also gave the Attorney General the authority to designate categories of offenses as particularly serious crimes that would bar asylum relief. Before this regulatory authority was granted, the Attorney General had evaluated whether an offense was a particularly serious crime on a case-by-case basis. Delgado, 648 F.3d at 1106; Frentescu, 18 I. & N. Dec. at 247. Because

17

Congress added this regulatory authority in the context of other legislation that increased the grounds to remove aliens, it would be inconsistent with this goal to believe that Congress replaced a case-by-case adjudicatory process with a regulation-only process, which would slow the identification of qualifying offenses and remove consideration of facts that reveal whether the specific alien is a danger to the community. See 8 U.S.C. § 1158(b)(2)(A)(ii); Gao, 595 F.3d at 557 ("It would be a Herculean task to sift through each state's code and prospectively identify by regulation every single crime that would qualify as particularly serious." (internal quotation marks omitted)).

In addition, the caselaw landscape before 1996 and Congress's reaction to it also show that inclusion of the "by regulation" language was a reaffirmation of regulatory authority. Since In re Frentescu, the Attorney General could proceed by adjudication. In other words, the adjudication door was open. By the time Congress added this language in 1996, however, the Court of Appeals for the Ninth Circuit had closed the other door by holding that the agency could not use rulemaking. Komarenko v. INS, 35 F.3d 432, 436 (9th Cir. 1994). Aliens in other circuits also attacked agency rules designating crimes as particularly serious as ultra vires, arguing that crimes could be particularly serious only if deemed so by adjudication. See, e.g., Ahmetovik v. INS, 62 F.3d 48, 52 (2d Cir. 1995) (alien "contend[ed] that the BIA should have conducted a broad inquiry into the facts underlying her conviction in order to determine whether the crime was 'particularly serious.'"). By adding "by regulation," therefore, Congress ended this debate: it rejected Komarenko and allowed the agency to proceed by rulemaking. Contrary to Judge McKee's contention that the phrase is meaningless, it

18

For these reasons, we hold that under the asylum statute, (1) aggravated felonies are a subset of offenses that constitute particularly serious crimes; (2) the Attorney General has the authority to designate other offenses as per se particularly serious; and (3) the Attorney General retains the authority, through a case-by-case evaluation of the facts surrounding an individual alien's specific offense, to deem that alien to have committed a particularly serious crime.

B

We next examine the phrase "particularly serious crime" in the withholding of removal statute to determine whether it also includes, but is not limited to, aggravated felonies. The "particularly serious crime" bar in that statute provides:

> Subparagraph (A) [providing for withholding of removal] does not apply to an alien deportable under section 1227(a)(4)(D) of this title or if the Attorney General decides that—
> . . .
>> (ii) the alien, having been convicted by a final judgment of a particularly serious

clarifies that both the adjudication and rulemaking doors are open to the agency, leaving the agency discretion to choose between them.

For these additional reasons, we conclude that the Attorney General has authority both to designate categories of offenses as particularly serious crimes and to decide whether an alien's offense constitutes a particularly serious crime on a case-by-case basis.

19

> crime is a danger to the community of the United States;
>
> . . .
>
> For the purposes of clause (ii), an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime.

8 U.S.C. § 1231(b)(3)(B).

In Alaka, we interpreted the phrase "particularly serious crime" as used in the withholding statute to be limited to aggravated felonies. 456 F.3d at 104-05. The Alaka court examined only the withholding statute, and no party presented the Alaka court with the identical phrase from the asylum statute. Thus, the Alaka court was not required to consider whether the use of the phrase in the asylum statute should influence its interpretation of the identical phrase in the withholding statute. Unlike our colleagues in Alaka, we must interpret the phrase as used in both statutes because Bastardo-Vale seeks both asylum and withholding of removal relief. We must therefore proceed in this case mindful that "[i]n all but the most unusual situations, a single use of a statutory phrase must have a fixed meaning." Cochise Consultancy, Inc. v. United States ex rel. Hunt, 139 S. Ct. 1507, 1512 (2019) (citation omitted); Smith v. City of Jackson, 544 U.S. 228, 233 (2005) ("[W]hen Congress uses the same language in two

20

statutes having similar purposes . . . it is appropriate to presume that Congress intended that text to have the same meaning in both statutes."). As a result, we will reexamine our earlier interpretation of the phrase "particularly serious crime" as it is used in the withholding of removal statute.

As we already stated, the phrase "particularly serious crime" as used in the asylum statute includes but is not limited to aggravated felonies. Examining the identical phrase in the withholding of removal statute, we reach the same conclusion. The withholding of removal statute specifically lists a subset of aggravated felonies deemed per se "particularly serious crimes." The statute provides that "an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime." 8 U.S.C. § 1231(b)(3)(B). Through this language, Congress designated a category of aggravated felonies based upon the punishment imposed to be a particularly serious crime. In the very next sentence, Congress expressly stated that its directive concerning aliens convicted of aggravated felonies and sentenced to five or more years' imprisonment did not "preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime." Id. The language embodies Congress's explicit statement that the Attorney General had the continuing authority to determine whether a crime is particularly serious. This demonstrates that Congress did not disturb the Attorney General's prior practice of deciding, on a case-by-case basis, whether an alien's crime was particularly serious. See N-A-M v. Holder, 587 F.3d 1052, 1056 (10th Cir. 2009) (observing that the "long history of case-by-case determination" of

21

particularly serious crimes "counsels against . . . a bright-line rule" for determining which crimes are particularly serious (citations omitted)).  Indeed, the language of § 1231(b)(3)(B) is permissive, not restrictive, in that it does not explicitly dictate that the only offenses that constitute particularly serious crimes are aggravated felonies.  See Delgado, 648 F.3d at 1104; Gao, 595 F.3d at 555; N-A-M, 587 F.3d at 1056.

Moreover, Congress used both "aggravated felony" and "particularly serious crimes" in the statute and, as stated earlier, we are obligated to give each word meaning.  See N-A-M, 587 F.3d at 1056 (holding that "Congress's use of two different terms—'particularly serious' crime and 'aggravated' felony—is additionally indicative of substantively different meanings").  To say that only aggravated felonies are "particularly serious crimes" would render the words "particularly serious crime" surplusage.  Put differently, if Congress did not intend for crimes other than aggravated felonies to disqualify aliens from withholding of removal, then it would have simply said that (1) an alien convicted of an aggravated felony and sentenced to at least five years of imprisonment is barred from relief and that (2) the Attorney General may, in his discretion, bar those who are convicted of an aggravated felony and who received sentences of less than five years from relief.  Congress's inclusion of the words "particularly serious crime" in addition to the words "aggravated felony" conveys that the bar may apply to those who are convicted of crimes other than aggravated felonies too when the Attorney General determines the offense is a particularly serious crime.

In sum, the language of the withholding of removal statute shows that aggravated felonies are a subset of

particularly serious crimes and that Congress has deemed one subset of aggravated felonies, namely those for which the alien was sentenced to at least five years, particularly serious per se. Our sister circuits have also embraced the view that the phrase "particularly serious crime" as used in the withholding of removal statute includes but is not limited to aggravated felonies. See Delgado, 648 F.3d at 1102-04; Gao, 595 F.3d at 554-55; N-A-M, 587 F.3d at 1056; Nethagani, 532 F.3d at 156-57; see also Valerio-Ramirez v. Sessions, 882 F.3d 289, 296 (1st Cir. 2018) (adopting a case-by-case approach for determining "whether a non-aggravated felony qualifies as a particularly serious crime rendering an alien ineligible for withholding of deportation" (internal quotation marks omitted)). Thus, under the language of both the asylum and withholding statutes, the phrase "particularly serious crime" means the same thing: both aggravated felonies and other offenses can be particularly serious crimes.[6]

In reaching this conclusion, we depart from our precedent in Alaka. In our Court, precedent is binding on later panels, 3d Cir. I.O.P. 9.1, and "[w]e do not overturn our precedents lightly," Al-Sharif v. U.S. Citizenship & Immigration Servs., 734 F.3d 207, 212 (3d Cir. 2013) (en banc). Indeed, this practice shows our Court's respect for the

---

[6] The differences in the statutes do not mean that the phrase "particularly serious crime" should be given a different meaning. While asylum is discretionary and withholding of removal is mandatory, and entitlement to asylum is met by a lower standard of proof than that required for withholding of removal, each statute reflects Congress's view that a "particularly serious crime" bars aliens from obtaining certain immigration relief.

23

role of stare decisis and the predictability it affords. See Payne v. Tennessee, 501 U.S. 808, 827 (1991) (noting that stare decisis "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process" (citation omitted)). This case, however, presents a "rare occasion" where departure is required for four reasons. See In re Grossman's Inc., 607 F.3d 114, 117 (3d Cir. 2010) (en banc). First, in the twelve years since Alaka, no other appellate court tasked with interpreting the phrase "particularly serious crime" has concluded that it only includes aggravated felonies. While we generally "decide cases before us based on our own examination of the issue, not on the views of other jurisdictions," these more recent decisions suggest that we should "consider whether the reasoning applied by our colleagues elsewhere is persuasive." Id. at 121; Joyce v. Maersk Line Ltd, 876 F.3d 502, 512 (3d Cir. 2017) (en banc) ("[W]hen our Court is in disagreement with every other circuit to consider a question, it can be wise to reconsider our prior reasoning."). Second, the phrase "particularly serious crime" is used in both the asylum and withholding of removal statutes and should be interpreted to mean the same thing. See, e.g., City of Jackson, 544 U.S. at 233. Third, by interpreting the phrase consistently across similar statutes, and similar to our sister circuits, we ensure that aliens in different circuits with identical convictions are treated similarly. Finally, as explained above, limiting the phrase "particularly serious crimes" to encompass only aggravated felonies "cannot easily be reconciled with the text" of the asylum and withholding of removal statutes. See Al-Sharif, 734 F.3d at 212. Therefore, we now overrule Alaka's definition of particularly serious crime as being limited to aggravated felonies and hold that the phrase "particularly

24

serious crime" includes—but is not limited to—aggravated felonies.

## III

Having determined that the phrase "particularly serious crime" can include offenses other than aggravated felonies, we now address the Government's argument that Bastardo-Vale waived his right to challenge the BIA's application of N-A-M- to his conviction.

"[A]n appellant's opening brief must set forth and address each argument the appellant wishes to pursue in an appeal." Barna v. Bd. of Sch. Directors of Panther Valley Sch. Dist., 877 F.3d 136, 145 (3d Cir. 2017). If an argument on appeal is not "supported specifically by 'the reasons for [it], with citations to the authorities and parts of the record on which the appellant relies,'" it is not properly preserved. Id. (quoting Fed. R. App. P. 28(a)(8)(A)). We typically decline to address arguments not properly preserved in the "original briefs" to us. See Daggett v. Kimmelman, 811 F.2d 793, 795 n.1 (3d Cir. 1987).

Bastardo-Vale failed to argue in his opening brief to us that the BIA improperly applied N-A-M- in concluding that his conviction for second-degree unlawful imprisonment was a particularly serious crime. Instead, Bastardo-Vale argued only that, because he was not convicted of an aggravated felony, the particularly serious crime bar did not apply to his claims for asylum and withholding of removal. Bastardo-Vale's clear focus on Alaka in his brief to our Court and his omission of any argument regarding the BIA's application of N-A-M- and its analysis of the circumstances of his offense constitutes a

waiver of any challenges to the BIA's assessment of whether his offense of conviction constitutes a particularly serious crime. Thus, we will leave the BIA's conclusion undisturbed.[7]

## IV

For the foregoing reasons, we will deny the petition.

---

[7] Even if Bastardo-Vale did not waive this argument, there is likely enough evidence to uphold the BIA's determination that he committed a particularly serious crime.

McKEE, *Circuit Judge*, dissenting

Today we hold that the panel in *Alaka v. Attorney General*[1] erred in concluding that "particularly serious crime," as that term is used in 8 U.S.C. § 1231(b)(3)(B), is not limited to aggravated felonies. Although I concede that the question is a close call, I agree with Judge Ambro that the category is limited to aggravated felonies. Accordingly, I join Judge Ambro's dissent from the Majority's analysis of that issue. For the reasons he explains in his dissent, I agree that Congress intended to limit particularly serious crimes in 8 U.S.C. § 1231(b)(3)(B) to aggravated felonies. However, like Judge Ambro, I also commend Judge Shwartz for her analytical approach in explaining the Majority's conclusion that *Alaka* was wrongly decided. I share the concern expressed in the Majority Opinion regarding the "IJ and BIA's blatant disregard of the binding regional precedent" of this Article III Court.[2] The Majority's approach of avoiding a discussion of *In re M-H-*,[3] and *Chevron* deference,[4] is in the best tradition of Article III jurisprudence.

Nevertheless, I cannot agree that the Majority has appropriately dealt with the unambiguous phrase "by regulation" in 8 U.S.C. § 1158(b)(2)(B); therefore, I must also respectfully dissent from the Majority's interpretation of that provision. As I explain below, my colleagues' analysis and discussion of that phrase simply reads it out of the statute. Although I appreciate the difficulties that can result from interpreting the statute as Congress wrote it, I am not convinced by the Majority Opinion that those difficulties justify simply ignoring the express limitation that Congress placed upon the Attorney General's authority to define crimes as being "particularly serious."

---

[1] 456 F.3d 88 (3d Cir. 2006).

[2] Maj. Op. at 6 n.1.

[3] 26 I. & N. Dec. 46 (BIA 2012).

[4] *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *See also Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005) (explaining when an Article III court owes deference to the administrative agency's interpretation of a statute).

# I.

Congress unambiguously stated that "[t]he Attorney General may designate *by regulation* offenses that will be considered to be a [particularly serious] crime."[5] My colleagues argue that the fact that the statute says the Attorney General "*may*" designate offenses as particularly serious crimes by regulation does not mean the Attorney General may *only* do so by regulation. They believe that Congress did not intend to preclude the Attorney General from also so designating offenses by agency adjudication.[6] They proclaim: "the grant of regulatory authority to designate classes of offenses as particularly serious crimes did not displace the Attorney General's authority to also make case-specific determinations concerning whether an alien's offense should be deemed 'particularly serious.'"[7] However, that proclamation ignores that Congress *did* expressly limit that grant of regulatory authority. It stated that the Attorney General could designate additional crimes "by regulation."

My colleagues suggest that Congress would have stated that "the Attorney General *shall* designate by regulation," if Congress intended to require the Attorney General to act by regulation only. However, inserting a command such as "shall" instead of "may" would almost certainly obligate the Attorney General to designate additional particularly serious crimes, whether or not the Attorney General would otherwise have done so. Surely Congress did not intend to require the Attorney General to designate additional crimes as being "particularly serious" within the meaning of the statute. Rather, Congress left that decision to the discretion of the Attorney General. Had Congress intended to allow the Attorney General to designate other crimes as particularly serious in any way that s/he chose, rather than relying on "may" in drafting § 1158(b)(2)(B), Congress would have said something like: "[t]he Attorney General may designate by regulation, *or otherwise*, offenses that will be considered to be a crime described in clause (ii) . . . of subparagraph (A)." Or, Congress could have omitted the limiting phrase completely

---

[5] 8 U.S.C. § 1158(b)(2)(B)(ii) (emphasis added).
[6] Maj. Op. at 13.
[7] *Id*. at 13–14.

2

and just said: "[t]he Attorney General may designate offenses that will be considered to be a crime described in clause (ii) . . . of subparagraph (A)." It chose not to do that, so the limiting phrase that was inserted must mean something.

My colleagues gloss over the fact that they are reading "by regulation" out of the statute by explaining "[t]his authorization . . . *is permissive* and does not preclude the Attorney General from evaluating, on a case-by-case basis, whether the facts and circumstances of a conviction also support concluding that an individual alien committed a particularly serious crime."[8] But simply saying the authority that Congress granted is "permissive" surely cannot negate the express limitation Congress placed on that permission or the resulting limitation on how the Attorney General may exercise that authority. The statute is permissive, but the permission is not absolute.

A simple and practical hypothetical is illustrative here. Assume that a child living in Newark, New Jersey asks her mother for permission to travel to New York City for the weekend, and the mother responds, "you may go to New York for the weekend." Now, imagine the mother's horror when the daughter calls from Los Angeles and tells the mother that she had permission to travel there because the mother simply said the daughter *may* go to New York, but did not say that the daughter may not go to Los Angeles or that she must go to New York. The daughter's claim of parental permission would be no less valid than the grant of congressional permission which my colleagues rely upon here. Yet, I think it is safe to assume that the daughter's explanation would be met with something less than enthusiastic approval. It is an argument that no parent would accept, and this Court should not accept it either.

The analogy is not as far afield as the very different context may suggest. Such "permission by omission" (or more precisely, license by omission) is exactly what the Majority is authorizing.

My colleagues explain that "[i]mmigration officials have proceeded via case-by-case adjudication since the early

---

[8] *Id.* at 13 (emphasis added).

3

1980s."[9]  They argue that "[w]e presume that Congress was aware of this procedure in 1996 when it granted the Attorney General the authority to identify by regulation categories of crimes that may be deemed per se particularly serious crimes."[10]  But therein lies the proverbial rub.  Congress did not have to include the limitation "by regulation" when the statute was amended in 1996.  It is much more logical to conclude that Congress included that limitation because it was concerned about what immigration officials had been doing "since the early 1980s," and wanted to limit the Attorney General's exercise of discretion.  Why else include the limitation – "by regulation?"  The fact that Congress was aware of what immigration officials had been doing for 16 years before adding "by regulation" to the statute is perhaps the strongest argument against the Majority's position.

The Majority Opinion attempts to rescue the jettisoning of this limiting phrase in part by citing to *Rossman v. Fleet Bank (R.I.) National Association*,[11] and arguing that we there relied upon the "'permissive sense' of the word 'may.'"[12]  However, *Rossman* is totally irrelevant to our inquiry here.  There, a borrower sued Fleet Bank arguing that a fee imposed that was not disclosed in the credit card solicitation violated the Truth in Lending Act.  The bank claimed that the credit solicitation only had to accurately disclose fees which were contemplated when it issued the solicitation agreement.  The Act required disclosure of "[a]ny annual fee . . . imposed for the issuance or availability of a credit card."[13]  A controlling regulation required disclosure of "[a]ny . . . periodic fee . . . that *may be imposed* for the issuance . . . of a credit or charge card."[14]  The borrower claimed that this meant that Fleet had to disclose any fee that may ever be imposed for the credit card.

---

[9] *Id*. (citing *Delgado v. Holder*, 648 F.3d 1095, 1106 (9th Cir. 2011) (en banc)).

[10] *Id*.

[11] 280 F.3d 384, 393 (3d Cir. 2002).

[12] Maj. Op. at 14 n.4.

[13] *Rossman*, 280 F.3d at 392 (quoting 15 U.S.C. § 1637 (c)(1)(A)(ii)(I)).

[14] *Id*. (quoting 12 C.F.R. § 226.5a(b)(2)) (emphasis in original).

4

However, applicable provisions of the Truth in Lending Act allowed the bank to make subsequent changes to fees as long as they did not "affect the accuracy of a previous disclosure."[15] We agreed with the District Court's conclusion that "*in this context*" the "use of the word 'may' does not compel adoption of plaintiff's interpretation."[16] Context matters; and the context in which "may" was used in the statute and regulation at issue in *Rossman* is wholly unhelpful to our inquiry into what that word means in the context of 8 U.S.C. § 1158(b)(2)(B)(ii).

My colleagues' allusion to a second problem with my interpretation of the asylum statute is not helpful either. They cite *Lorillard v. Pons*[17] to argue that we presume Congress was aware that the Attorney General had been defining new crimes as serious crimes on a case-by-case basis and that Congress therefore accepted the practice by subsequently re-enacting the statute "without change."[18] However, as I explain in more detail below, Congress did not reenact the statute "without change," it amended it by adding the limitation "by regulation," thereby limiting the authority of the Attorney General.

In order to justify reading "by regulation" out of the statute, the Majority Opinion also partially relies upon a discussion of some of the regulatory history and agency and judicial decisions that preceded the 1996 amendments.[19] That analysis may have some relevance to an inquiry into the meaning of an ambiguous statute. However, there is nothing ambiguous about the phrase "by regulation" or any other part of the statute that we are discussing, and my colleagues do not suggest that there is any ambiguity. Accordingly, much of the discussion in footnote five of the Majority Opinion should simply be irrelevant to our inquiry here. It is the cardinal canon of statutory interpretation that a court must begin with the statutory language. "[C]ourts must presume that a legislature

---

[15] *Id.*

[16] *Id.* at 393 (emphasis added).

[17] 434 U.S. 575, 580 (1978).

[18] Maj. Op. at 13.

[19] *Id.* at 13–17.

says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete."[20]

The Majority's analysis is also contrary to our obligation to give effect to each word of a statute "so that no part will be inoperative or superfluous, void or insignificant."[21] Ironically, the Majority Opinion stresses that its reading "give[s] effect to every word of the statute."[22]  But simply saying so does not make it so.  It completely ignores the limiting phrase: "by regulation."

I realize, of course, that the Supreme Court has long held that courts must presume Congress intended "a sensible construction" of statutes and that any interpretation that produces an absurd result suggests that Congress did not intend that which the text of a statute would otherwise require.[23] However, neither the Majority here, nor the decisions of our sister courts of appeals that are relied upon, make any serious attempt to show that limiting the Attorney General to the regulatory process would create such an absurdity and therefore counsel against a literal interpretation of "by regulation."  Merely saying that such a limitation "would impose an onerous burden,"[24] does not mean that it would create an absurdity.  Many restrictions on government action may be viewed by some as onerous or burdensome.  That is

---

[20] *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) (internal citations and quotations omitted).

[21] *Corley v. United States*, 556 U.S. 303, 314 (2009) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)).

[22] Maj. Op. at 11 (citing *Leocal v. Ashcroft*, 543 U.S. 1, 12 (2004)) (internal quotation marks omitted).

[23] *United States v. Kirby*, 74 U.S. 482, 486–87 (1868). *See also Encompass Ins. Co. v. Stone Mansion Rest. Inc.*, 902 F.3d 147, 152 (3d Cir. 2018), *reh'g denied* (Sept. 17, 2018) ("Nevertheless, it is also a 'basic tenet of statutory construction . . . that courts should interpret a law to avoid absurd or bizarre results.'") (quoting *In re Kaiser Aluminum Corp.*, 456 F.3d 328, 338 (3d Cir. 2006)).

[24] Maj. Op. at 17 (quoting *Ali v. Achim*, 468 F.3d 462, 469 (7th Cir. 2006)).

particularly true of restrictions on governmental exercise of power. Indeed, the entire regimen established under the Immigration and Nationality Act and related treaties impose burdens on the Executive's exercise of authority. But burdensome limitations do not automatically rise to the level of an absurdity for purposes of statutory construction.

Nevertheless, my colleagues do insist that limiting the Attorney General to the regulatory process "would impose an onerous burden."[25] However, the "burdens" imposed by requiring the Attorney General to engage in rulemaking to supplement the list of crimes that are particularly serious are not so onerous or impossible as to make the resulting scheme absurd. To the extent that requiring the Attorney General to invoke the regulatory process before allowing the Attorney General to exclude an entire category of persons from eligibility for a favorable exercise of discretion imposes an undue burden, it is a burden that Congress, and not the courts, must mitigate.

## II.

My colleagues also rely on decisions of our sister appellate courts for their conclusion that "by regulation" includes case-by-case adjudication, but those decisions are devoid of the kind of analysis that should be required before ignoring an unambiguous statutory limitation on the authority of the Attorney General. Most of the cases relied upon by the Majority contain precious little (if any) analysis of the limiting phrase "by regulation" in § 1158(b)(2)(B). They merely recite the statutory text, don jurisprudential blinders, and blithely conclude that the statute doesn't say what it says. For example, in *Ali v. Achim*, relied on by the Majority, the Court of Appeals for the Seventh Circuit actually stated: "[n]owhere does [the statute] purport to prohibit the Attorney General from determining in a given case that an alien's nonaggravated felony is 'particularly serious' unless he had the foresight to explicitly itemize that particular crime by regulation. The statutory language simply is not susceptible to such a limited interpretation."[26] But of course, the statute is not only susceptible to that interpretation; it says exactly that in

---

[25] *Id.*

[26] 468 F.3d at 469.

unmistakable language. By its very terms it does "purport to prohibit the Attorney General from determining in a given case that an alien's nonaggravated felony is 'particularly serious' unless" the determination is done "by regulation." The court's declaration to the contrary is nothing more than *ipse dixit*, and my colleagues' citation to it is also an *ipse dixit*; it could not more clearly conflict with the statutory text.

Similarly, in *Delgado*, the Court of Appeals for the Ninth Circuit relied on *Ali*'s analysis to conclude that, even though the statute "is silent on case-by-case adjudication," it "does not require the Attorney General to anticipate every adjudication by promulgating a regulation covering each particular crime."[27] But the statute is not silent on case-by-case adjudication. Moreover, the *Delgado* court was affording *Chevron* deference to the BIA.

Two issues relevant to our discussion were before the court in *Delgado*. First, whether the withholding statute limited particularly serious crimes to aggravated felonies; and second, whether, under the asylum statute, the Attorney General was limited to the regulatory process in order to declare other crimes particularly serious. On the first question, because there was no controlling judicial precedent to guide its analysis, the court relied upon *Chevron* and deferred to the BIA's interpretation of the statute. The court's analysis can be summed up in its statement: "[u]nder *Chevron,* we owe deference to the BIA's interpretation."[28]

The court then decided that "by regulation" also included case-by-case adjudication, in part by deferring to the BIA. It stated: "[b]ecause the history of the withholding and asylum statutes are similar, our conclusion as to the withholding statute is instructive."[29] The court then cited the BIA's history of case-by-case adjudication and concluded that "the Attorney General has the authority to designate offenses as particularly serious crimes through case-by-case adjudication."[30] Since the court failed to provide any in-depth

---

[27] 648 F.3d at 1106.

[28] *Id.* at 1102.

[29] *Id.* at 1106.

[30] *Id.* (citing *Ali*, 468 F.3d at 469).

analysis of why it could ignore the clear limitation in the statute, it does not provide much guidance for our inquiry into the meaning of this unambiguous statute.

The other case that the Majority relies upon for the proposition that "by regulation" includes case-by-case adjudication is *Gao v. Holder*.[31] *Gao* suffers from similar flaws. There, the Court of Appeals for the Fourth Circuit cited to the decision in *Ali*. It, too, read the explicit limitation, "by regulation," out of the statute, concluding that "nothing in the statute says that the Attorney General must use regulation to designate crimes as particularly serious."[32] Thus, as in *Ali* and *Delgado*, the court put on blinders and concluded that the statute does not say what it says. And, as in *Delgado*, the court then proceeded to defer to the BIA's decision to determine particularly serious crimes on a case-by-case basis.[33] It concluded "the choice made between proceeding by general rule or by individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the administrative agency."[34] However, that is clearly not true where, as here, Congress has imposed limits on the exercise of that informed discretion. These decisions simply do not provide sufficient support for us to ignore the text of this unambiguous statute.

Moreover, as my colleagues note, and as I have noted above, Congress specifically amended the asylum statute to add the limiting phrase: "by regulation."[35] I have already mentioned this, but I think it is worth reiterating that the limitation was not included in the asylum statute before 1996.[36] The statute simply barred asylum where the alien committed any aggravated felony. The Attorney General did not have any authority to deny asylum based on the commission of any other

---

[31] 595 F.3d 549 (4th Cir. 2010).

[32] *Id.* at 556.

[33] *Id.* at 556–57.

[34] *Id.* at 556 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947)).

[35] *See* Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104–208, div. C., tit. VI, § 604(a), 110 Stat 3009.

[36] *See, e.g.*, 8 U.S.C. § 1158 (1996); 8 U.S.C. § 1158 (1994).

category of crime.[37]  If we are to give each word in the statute meaning,[38] we must conclude that Congress specifically added "by regulation" to give the Attorney General a power which he did not already possess.  "When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect."[39]  Congress clearly thought that the Attorney General needed authority to designate other offenses as particularly serious crimes "by regulation."  If my colleagues are correct and adding "by regulation" does not limit the Attorney General to the regulatory process, then that phrase in the 1996 amendment is absolutely meaningless.  However, that conclusion violates our obligation to give meaning to every word of a statute.  If a congressional grant of authority was necessary to allow the Attorney General to designate offenses as particularly serious "by regulation," then the Attorney General should need a congressional grant of authority to designate offenses as particularly serious by BIA adjudication.

## III.

Accordingly, for all the reasons I have set forth above, I must respectfully dissent.

---

[37] *See* 8 U.S.C. § 1158(d) (1996).

[38] *Leocal*, 543 U.S. at 12 ("[W]e must give effect to every word of a statute wherever possible.").

[39] *Stone v. I.N.S.*, 514 U.S. 386, 397 (1995).

Carlos Eduardo Bastardo-Vale v. Attorney General
of the United States
No. 17-2017

AMBRO, <u>Circuit </u>Judge, dissenting

       I join in full Judge McKee's dissent relating to the interpretation of "by regulation" in 8 U.S.C. § 1158(b)(2)(B), which deals with asylum. Thus, I write only with respect to whether a "particularly seriously crime" in the withholding-of-removal provision of 8 U.S.C. § 1231(b)(3)(B) covers more than an aggravated felony. It reads in part as follows:

> [Withholding of removal] does not apply. . . if the Attorney General decides that—
>
>> (ii) the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States;
>> . . .
>
> For the purposes of clause (ii), an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime.

Judge Shwartz, writing for the majority, holds that a "particularly serious crime" is not limited to an aggravated felony. This overrules the contrary reading of *Alaka v. Attorney General*, 456 F.3d 88, 104-05 (3rd Cir. 2006), a decision I authored as a matter of statutory interpretation. Though I disagree with our new interpretation, I commend Judge Shwartz for construing the withholding-of-removal provision in that analytical framework instead of focusing on whether the BIA's decision, rendered after *Alaka*, in *In re: M - H*, 26 I & N Dec. 46 (BIA 2012), is entitled to *Chevron* deference, an issue neither briefed nor decided in *Alaka*.

I do, however, continue to believe that *Alaka* got this right, and that the majority misreads the language of the withholding-of-removal statute. The first sentence of the clarifying paragraph makes all aggravated felonies carrying a sentence of more than five years particularly serious; the second, which expressly refers back to "[t]he previous sentence," authorizes the Attorney General to declare certain other crimes as particularly serious "notwithstanding the length of sentence imposed." On its face this appears to mean that the Attorney General's discretion qualifies only aggravated felonies that resulted in a prison sentence of less than five years, and it does not extend to other crimes. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 154 (2012) ("A proviso conditions the principal matter that it qualifies—almost always the matter immediately preceding.").

Thus the provision creates a three-tiered system: (1) certain aggravated felonies automatically are particularly serious (those with actual, aggregated prison sentences of at least five years); (2) other aggravated felonies with lesser prison sentences can be considered particularly serious on a

2

case-by-case basis free of the need to do so by regulation; and (3) all other crimes are not particularly serious.[1]

The majority holds to the contrary that the Attorney General's power conferred by the second sentence is effectively unlimited, but this does not fit the language of the statute. If that had been Congress's intent, it would have worded the provision differently, either adding "for any crime" after "notwithstanding the length of sentence imposed" or simply stating that "the previous sentence shall not preclude the Attorney General from determining in any other case that an alien has been convicted of a particularly serious crime." Yet Congress did not enact any such addition. Neither should a court.

I respectfully dissent.

---

[1] This is different from the asylum statute, which creates only two tiers: aggravated felonies, all of which are particularly serious, and all other crimes, which may "by regulation" be designated as particularly serious. 8 U.S.C. § 1158(b)(2)(B)(ii).